20-2679 from the Western District of Arkansas, J.B. Hunt Transport v. BNSF Railway Company Mr. Bueland? May it please the Court. My name is Corey Bueland and I represent Appellant J.B. Hunt Transport. The District Court's July 21, 2020 order misinterprets the arbitration awards and takes away from Hunt the valuable relief it won in connection with Section 3A of the Joint Service Agreement. BN's argument that it can limit the rates it provides to Hunt relies on a misreading of a few words in Section 3A and upends the panel's interpretation of those words on an equivalent or at least as favorable basis and for comparable service. BN tried and failed to convince the arbitration panel that these words meant BN only had to share a rate with Hunt if that rate was better than the revenue divisions Hunt would otherwise pay. It argued that it only had to share rates that were equivalent or more favorable than what Hunt otherwise paid. The arbitration panel expressly considered, recited, and rejected this argument at page 11 of the final award. The panel rejected BN's argument because the words equivalent or at least as favorable do not limit the rates that BN must share with Hunt. The words mandate only that the terms that accompany those rates must be the same or better than the terms that accompany the rates when they were given to other TLMCs or truckload motor carriers, companies like J.B. Hunt. To put it more simply, what Section 3A and the final award say is that BN must give Hunt any rate it gives to another trucking company, any rate full stop. The equivalent or at least as favorable language means only that when BN gives each rate to Hunt, it has to be accompanied by terms that are equivalent or at least as favorable to the same strings that were attached to that rate when given to the other trucking company. Now, here is how the district court completely changed the meaning of Section 3A and the final award by reordering the language of Section 3A and literally adding words to it that aren't there. Now, I'd like to refer the panel to page 11 of the district court's opinion. That can be found at addendum 11 or appendix 1038. Now, I'm in the middle of page 11 of the district court's award, the language starting by the same token, and this is what the district court wrote. By the same token, the panel never required BNSF to provide all rates it quotes trucking competitors to J.B. Hunt. Instead, the panel explained that BNSF was required to disclose only, that's a new word, only those rates that BNSF offered to any other truckload motor carrier if, another new word, if equivalent to, and the to has been added, to or at least as favorable as the rates quoted to J.B. Hunt for comparable service. The district court's insertion of these new words in the reordering, if only equivalent to, changed the meaning entirely from what Section 3A says and what the final award says. Neither Section 3A or the final award envision any comparison between the rates BNSF offers to other carriers and the revenue divisions that Hunt would otherwise pay. The comparison that is called for in Section 3A, the equivalency, is only between the terms that accompany the rates when they're offered to others and the terms that accompany those same rates when offered to Hunt. Well, Your Honor, what Section 3A says is that Hunt can only use them for comparable service. They can only be used for comparable service and Hunt has never argued otherwise. When they quote us the coach rate, we only can use that for our coach service. But Hunt essentially uses every service that BNSF offers. It's by far, I believe, its biggest trucking company that uses the intermodal service. So the idea that there's this big universe of types of service, comparable services, the final award would say, that Hunt is not using and therefore wouldn't see, that's just not true. That's not what the screening's about. It's about this idea that BN has a black box approach where it's deciding, looking at a dozen factors and we don't know what else, that these rates aren't really better for Hunt in our estimation and its counterpart is estimation. Now, unlike the district court, the panel agreed with Hunt's reading of Section 3A. And I direct the panel's attention to page 11 of the final award. That can be found at Appendix 32. And I'm going to look at the bottom of that page and read from it very briefly. So at the bottom of page 11 of the final award, Appendix 32, this is what the panel said Section 3A means, consistent with what Hunt argued throughout the arbitration. In exchange for committing to BNSF all of Hunt's intermodal shipments in geographic areas served by BNSF, Hunt received, among other things, BNSF's commitment to make available to Hunt on an equivalent or at least a favorable basis for comparable service. Those rates BNSF makes available to any other truckload motor carrier, giving Hunt the option to pay those rates instead of the revenue divisions. Here, the panel gave the plain meaning to the words equivalent or at least as favorable, recognizing they are the basis upon which the rates must be shared, not a screen. Neither Section 3A nor the panel said, as the district court later held, that BN would only need to make rates available if they are the same or better than what Hunt was effectively paying under the revenue divisions. Now, the panel's rejection of BN's screening argument becomes crystal clear when it's put into context. Now, in the arbitration, BN pressed repeatedly for a right to screen rates just as it claims it can do now. And you can find this argument very clearly at pages 412 and 413 of the appendix, which is the submission BN made to the arbitration panel when this specific issue came up. Now, BN insisted that the panel should require Hunt to provide all sorts of detailed bid information for each of Hunt's customers, so it could undertake this process within BN to decide which rates BN believed were actually more favorable for Hunt than the revenue divisions, and told the panel it should only have to provide those rates it deemed better. Hunt urged the panel, and this is found at appendix pages 445 to 446 in its submission, to reject these screens, to reject conditioning the Section 3A obligation on Hunt sharing any information with BNSF, and reject any efforts BN wanted to undertake to analyze the rates internally and screen them out. Now, the panel sided with Hunt and rejected BN's argument that it be allowed to screen, and this can be found explicitly on page 11 of the final award above the paragraph I just read. And here is how the final award framed BN's argument quite fairly. As it did in the first plenary hearing, BNSF argued that, as a predicate to its compliance with Section 3A obligation to provide rates to Hunt, Hunt must first provide to BNSF the rates that Hunt quotes or provides to JSA customers, including all the information that BNSF claims is necessary for it to determine if the rates it quotes to other truckload motor carriers are lower than the revenue divisions it receives from Hunt. And now the panel rejected that explicitly. Section 3A of the JSA does not expressly contain any such requirement, nor is BNSF's obligation to make rates available to Hunt thereunder expressly predicated upon Hunt providing any such information, or on whether such rates are lower than the revenue division BNSF receives. So quite directly, the panel rejected both legs of BNSF's screening argument, that it was entitled to this detailed information that BN said is absolutely necessary to conduct a screening analysis. And you can find BN's statements repeatedly that it needed more information to actually screen the rates properly at Appendix 696 and 97 and Appendix 892 and 893. And the panel said, no, your obligation doesn't depend on getting that information, and moreover, your obligation to share rates isn't contingent on whether you think those rates are better for Hunt. Now, despite the clear language from the panel, the district court held the exact opposite. Let me interrupt you there and just ask a question for clarification. If the comparison was confined only to rates, then it seems to me that what BNSF contends would maybe make sense, because they would just be comparing the monetary charges. But I'm gathering that there are other factors or conditions that go with these, go along with the various rates that have to be taken into consideration by the carrier. Is that correct? And then secondly, if that's correct, can you give some examples of what these other factors or considerations might be kind of as a practical, in practical application? Give us like a real world example of what these additional considerations or factors would be? Absolutely, Your Honor. So the first question, you're exactly right. And that's why BNSF said it needed all this detailed information over and over to screen the rates. And that's why there's 12 factors set out in the final award that the parties are supposed to together apply, not BNSF, but the parties. And let me give you an example of why the rates, which rate is better often depends on so many factors. The rates that BN pays under these revenue divisions is a straight percentage of the charge. It's very simple. It's all in rate, whereas the rates according to other carriers are traditionally a la carte is how I call it. I'm sure there's a better word in the industry, but there's different charges and fees for every little service along the way. So whether that rate is better for Hunt on any particular load depends on who Hunt's customer is and what they need. Do they need the cargo to sit at BNSF's facility longer? Because that might raise the rate that's quoted. Do they need extra personnel to go along with that load for loading or unloading? There is one of the factors you might see, you will see in the final award on page 10 is this idea of free empties. Some rates come with freebies with them. When you order this rate, we'll move an empty container back somewhere else for you for next time you need it. And the value of that would depend, of course, on what Hunt might be paying to move empties otherwise and its need for empties. How many does it need? And so I think those are just a couple of factors that show how fact intensive an inquiry would be of whether Hunt determines that this rate for this customer today is better than the revenue division. Mr. Bueland, how does your position square with the interim award statement that Section 3A doesn't impose duties to monitor, enforce, or report the status of ongoing rate structures offers made by either party to its customers? Well, what I think that response was in, that was in response to BN's argument that Hunt had to report everything it was doing. But the panel was very clear, even in the interim award, Your Honor, that Section 3, I'm sorry, that the panel finds that the effect, and this is at page 186 of the appendix, it's in the interim award. The panel finds that the effect of the plan language of the JSA, each party must comply with the provisions to exchange data and provide information on rates that set out in the JSA. And then it goes on at page 189 of the appendix that's in the interim award, and I'm not sure the interim award page number, that BNSF is required and shall provide to Hunt any rates for movement of dry vans, and it goes on. So I understand the language Your Honor's talking about, and I think that's more in response to BN's demand that Hunt provide all this extra information that's not specifically required under Section 1, whereas BN was arguing that Hunt had that duty under Section 3A. What I'm quoting says by either party. Your Honor, and I don't think that there's, again, the detailed bidding information is required, and this was in response to the arguments being made to the panel. But it is quite clear in the interim award and the final award that BN has an obligation to share any rates it makes available. I think the panel said that over and over. Now, this follows up on Judge Shepherd's question earlier, but the district court's interpretation of the final award that lets BN unilaterally screen these rates and apply all the factors itself is also inconsistent with the final awards directive. That would be the parties that consider and apply the comparable service and equivalent basis factors. That can't happen when BN applies them in its own black box process. Now, I see that I've run up on the time I'd save for rebuttal with Ms. Rudolph. So, subject to Your Honor's further questions, I'll sit down at this point. Thank you, Mr. Bielan. Mr. Donovan? Yes, good afternoon, Your Honor, and may it please the court, Daniel Donovan for BNSF Railway. The district court's judgment should be affirmed. The district court properly confirmed the final arbitration award pursuant to the FAA, and the district court properly denied Hunt's motion for what they called enforcement of the award. So, the first principle is the parties agree that the final award was proper and it should be confirmed. No party raised any grounds to vacate, modify, or correct it. So, confirmation of the award was indisputably correct. But Hunt went further. Hunt sought relief from the district court that it did not secure from the arbitration panel. Hunt moved to enforce the final award, and I submit what it really was was a motion to modify the final award or add interpretations that were not contained in the final award. Because, of course, once the final award is confirmed, if it's in there, they have the judgment. If it's not in there, they're asking the district court to do something in addition, which the case law doesn't permit. And we submit the district court correctly rejected Hunt's enforcement relief. On appeal, I'd submit that Hunt is the dog that caught the car. They had a final arbitration award, and they asked the district court to interpret it. And we submit all the district court needed to do was confirm it, and parties have whatever the arbitration panel awarded. But having asked the district court to review the award, Hunt doesn't like the district court's ruling, and thus this appeal. But critically, for the district court found that the final award was clear, and Hunt doesn't dispute that. It's unambiguous, and thus rejected Hunt's enforcement request. I submit once you have confirmation of a clear, unambiguous final award, there is nothing further for a federal court to do. So the judgment should be affirmed for several reasons. First, there's an issue Mr. Buolin didn't address, and that is the legal issue that you cannot enforce an arbitration award before confirmation. And that's what the district court agreed with us. So until it's confirmed, there isn't grounds for enforcement. Does it necessarily have to be two separate proceedings? I mean, why couldn't the court confirm it and then go on to enforce it? They could, Your Honor, but what the issue here is, it's really this nuance in the cases, right? If they're asking for enforcement, right, you first need the confirmed award, and then what are they enforcing, right? This goes to the footnote Judge Brooks had, which is all the panel did was denied their breach of the MFN. Remember, they lost their breach of contract claim on the MFN. And the panel rightfully, look, these parties have been fighting over this for a while, so the panel gave really declaratory relief, saying these are what the factors comparable service means going forward that you should use. There's nothing to enforce once you confirm the final award. What Hunt is trying to really inch into is they're saying not really enforce, because this goes to your question of can you do it before or after, but they're saying is there's additional relief a district court could give, which is true in narrow circumstances, but that's in the cases where you have an arbitration award and you have to do some math for the damages calculation, or there's some ministerial act. That's not what was happening here, as I'm going to show you, because I come back to if the relief that Hunt wanted, that is, they wanted to enforce the final award, they have that. It's a judgment of the court. If they wanted something in addition, which I submit they did, they wanted interpretations they didn't get, the district court rightly, as a federal court, is not able to do that. He confirmed the award. It's now a judgment. Either party can go forth to enforce it. Let me turn to what is... Mr. Donovan, I get the point. You say it does have to be two proceedings, right? No, it depends on the kind of relief. Really what Hunt was asking, because the cases they cite, they say sometimes you might have, this isn't this case, but you might have an arbitration award where the arbitration panel doesn't foot the final damages. And that's that RJA reinsurance case they cite. So in that, I agree, a court could do the math and then kind of enter that. But at least as a procedural matter, if you're truly trying to enforce it, if they wanted to go in today, and these are some of the cases of this court and the other courts, they say you first need a confirmed award. And then the day after, right thereafter, the sequence doesn't really bother me. The sequence would then be, are you enforcing it? But my point, Your Honor, is that there's nothing to enforce because they agree it's a clear, unambiguous final award. And let's remember, under the FAA, the federal court's job, if everyone agrees that it's an unambiguous final arbitration award, is to stamp it confirmed. It's now a judgment of the court and the parties can proceed. It's a judgment just as if we have any other trial judgment. You can then come and enforce it. But let's remember what happened here. Hunt wanted over $140 million for breach of this MFN. They lost that. OK, they lost it. It was denied. And the panel said, well, you guys have been in each other's throats. We're going to give you some declaratory relief. We're going to say what comparable service means. And that's what they did. Nobody won or lost that. They simply told the parties as you go forward, this is how you're supposed to do it. And let me turn first to this all rates argument, because I think it's important. The panel, you can look in the final award, and Mr. Bueland didn't point you anywhere, that the panel never ordered BNSF to disclose all rates that it provides. And remember, these are rates it provides to Hunt's competitors. OK, the panel never ruled that. Instead, they sent out a process that's in the final interim award. It's at the appendix of page 80. And it said that Hunt has to provide Section 1 information. And then if there is such an MFN rate, as they call it under Section 3A, BNSF has to provide that rate. And Judge Shepard, to your question, this is just math. You look at the two rates. And then when you give that rate, you give all the detail to those comparable factors. And that's, in fact, what BNSF did. There's one in the record, if you wanted to look. It's at the appendix at 1020, which is one of these rates. And it says what the rate is, and it lists all those comparable factor information for Hunt to review, to have discussions with BNSF. But the most critical point is nowhere in this final award did Hunt get a ruling from the panel that it had to disclose all rates. It didn't happen. In fact, the evidence was that Hunt never even requested BNSF to disclose all rates until this arbitration 25 years after the JSA began. And in the 2005 arbitration, which, again, between these same parties, Hunt had a different position. They said, well, we don't want all rates. We just want rates that are lower than your average rates. So, again, this was kind of made up 25 years later, and the panel rejected it. It was so made up that when Hunt asked this panel for it, they created what they called a hypothetical rate form that can't be found in the JSA or any of the course of dealing. And an issue, Judge, you were ahead of me, but in the 2005 arbitration, and then this panel adopted, this is at the appendix, page 77 of the first interim award. It says as follows, the relevant claim preclusive race judicata issues that were decided in the 2005 arbitration included the following observation as to resolution of the primary question of law pertaining to Section 3A. Neither the current JSA nor the predecessor JSA included any language which imposed duties to monitor, enforce, or report the status of ongoing rate structures slash offers made by either party to its customers. So there's no express finding that we had to give all rates because, believe me, we litigated this for years. And number two, Mr. Bulan's implicit argument that somehow they did would run right headlong into this finding, which said it was the primary question that neither party has to do it. And then before I move on and all rates, I want to say it also makes no sense what they're arguing. They're arguing that this is an MFN. That is, we get to use more advantageous rates. Hunt's argument is they want all those rates that we give to their competitors so one can scratch their head and wonder why they want it. But they want the higher rates that they wouldn't use. That makes no sense. And I submit you can look in all the awards. That never happened. So then Mr. Bulan and Hunt argues, well, wait. Counsel, let me interrupt you there. Your last statement, as I'm following along here, is it possible that a higher rate might be preferable when you consider the various conditions that go with it? Yeah, if you look at the record here, Judge, the answer is no. Hunt and BNSF are longtime small P partners. And the record will show Hunt has the best of everything. And rightfully so. They want this to be successful. These comparable service categories are something that Mr. Bulan referred to empty containers, which is if you imagine there's a container going from San Bernardino on the west coast to Chicago. Well, to get that container back, someone else would have to pay for that empty ride on the rails. Hunt gets that for free. So none of these, nothing in the record would support that. In fact, all of Hunt's damages calculation was only for lower rates, Judge. But going to this point that Mr. Bulan had, that BNSF asked for bid information, that is true. BNSF said, look, we'd like to know, because it's our joint customer. Remember, it's a joint service. We'd like to know what the bid is to see whether or not we have a lower rate. And Hunt, as the panel said, this is at the appendix at page 76 of the interim award. They made clear, they said Hunt is and has been in sole command of the prices quoted to shippers. The next page they go on to say there's no evidence that were Hunt to so query BNSF as to each and every rail rate that BNSF would refuse to furnish the most favorable applicable rail rate. But they go on to say that's not what happens here. Hunt sets these rates. So, therefore, what BNSF was asking for was the bid packages. And fair enough, the panel didn't give that to us. Okay. But that's all they were talking about in that quote. They were not converting something where they rejected a procedural request by us to get bid information and to suddenly say we have to give all rates. And I come back on this section. The biggest takeaway is if it's whatever rights Hunt has in the final award, they have. Same thing for BNSF. We've got a quarter of a billion dollars. But with that, that's what we get. And that is an enforceable judgment. But it's not now to come to a federal district court to ask for holdings interpretations that it wasn't able to get from the panel. Now, I want to turn now to an argument in the briefs that wasn't raised by Mr. Bueland. They kind of take the district court to task by saying Judge Brooks in his summary refers to something as a best rate. And in that, in his opinion, what he says is he was distilling the legalese of the provision. And this is at page 11 of Judge Brooks' opinion. He says distilling the legalese. The panel simply found that J.B. Hunt is entitled to BNSF's best price in order to calculate the rate attributed to BNSF's portion of the jointly provided service. OK, that argument by Hunt that that doesn't change the final award. He is doing what all judges do is he's, in fact, distilling what is a lot of information into a pretty clear sentence. But the suggestion that Judge Brooks was trying to change anything, he was doing the opposite. In fact, he said, I am simply going to confirm the award. That's the judgment, which is what we asked to be confirmed or affirmed is simply that the final arbitration award is confirmed. And that's consistent with Section 9 of the FAA. And there's no further role for the federal courts. So let me briefly address Hunt's other argument that is on these comparable service factors. Mr. Donovan, before you go there, one quick question. What rate information do you think the award requires BNSF to disclose? Sure. We are required to disclose if there is a lower rate we offer to another truckload motor carrier. And when we do that, we have to disclose all the comparable service. So let me give you an example. I think it's important to understand. So BNSF. So let me just follow up on that. So it's your position that the award gives BNSF the unilateral ability to determine whether it's a lower rate being provided. Yes. And that's right in if you look. But that is in the end of the line. But the answer is yes to your question, Judge. But let me explain. So all the other truckload motor carriers, BNSF sets the rates. And for almost all rates, we say this is March. Starting, I'm sorry, April, May 1st through May 31st, the rate from San Bernardino to Chicago would be $1,700. Okay. You could use it, not use it. Here's our conditions. And that's what for everyone else we get to set the rates. With Hunt, this has been successful. But they have the unbelievable right of being able to price on BNSF's railroad. They get to go with knowing there's just a split of the price, call it 60-40 on that lane. So Hunt can go to a customer, let's make one up, Target, and say we will move all containers for the year at this rate from San Bernardino to Chicago. And Hunt knows they don't have to worry about what BNSF is going to charge Hunt. They just know BNSF is going to get that 60% of the rate. And what it says is assume every month we get what our revenue division is because we don't face the customer. We get it from Hunt. We get it the next month. So what we do is this is referred to as the market-based index in the award. As we look at that, and, in fact, Hunt's prices are driving that. And whatever Hunt's prices are, frankly, set what we are willing to give to those other truckload motor carriers for the next month. And that's why there's almost never one of these rates. There are some every once in a while. They're usually one-offs in kind of odd situations. But that's what the panel understood. They have 4,000. We have 17 days of trial. The arbitration panel understood this and rejected Hunt's argument that we have to give them all rates. Now, they did rule that comparable factors. And this isn't a win for Hunt. This isn't a win for BNSF. They simply said these are the factors that you need to take into account because we were having a debate about what comes into account. Because, for example, one customer might have to pay within one week of service. Another customer might have to pay 90 days. These free empties, Mr. Buellen. That has economic value. And we briefed that, and the panel listed those out. And that's the end. That's the end of that. And we disclose that every time. And Hunt's argument asking for an additional ruling by the district court that somehow this was exclusive just isn't in the award. I'm not sure it's a real issue, to tell you the truth. But it certainly was, Judge Brooks said, there's nothing in the award that says those factors are exclusive or you can't talk about them. Well, all right. If I recall right, though, the panel gave the two parties the opportunity to work something out. And then when they couldn't work it out, then the panel issued this list of factors. Why wouldn't that be on its face exclusive? Well, it didn't say that. I think in most cases, Judge, it is. The issue that came up was is there's something called the Joint Management Committee that is three members from Hunt and BNSF make up this committee. They talk about these rates. You know, it shouldn't surprise anyone. They talk about the business all the time. They talk about these rates. And what came up with the arbitration panel is we argued is, look, we should be able to add other ones in the future. We may have. And that's all that came up. I don't disagree, Judge, that in most cases that very well may be the entire universe. That's why I think this argument is kind of a makeweight. I'm not sure it's a real dispute. But the bigger point, I think Judge Brooks is right as a federal judge, is he just said, look, I'm not going to add any gloss to this. He goes, it is what it is. Like, if you guys, you know, they set it out. Everyone agrees it's unambiguous. I, as a federal judge, and this was the second reason he said, he says, I'm not going to rephrase, interpret, or subject to further gloss anything here. And Hunt argues, well, this is a black box then. But that's not true. First of all, again, I come back, the parties have this joint management committee. They have quarterly meetings. They have PowerPoints that are like this thick. They're being strategic. They jointly want to get more business and make more profits. And, frankly, it's good for them. And this is kind of a remarkable service, as you'll read in the award, between these two parties that came to light. But all the factors are disclosed when there's Section 3A, right? And, frankly, both parties, remember, BNSF has to accept the split payments from Hunt. Now, if we have an issue with that, the same way if Hunt has an issue the way we're doing the MFN analysis, there is expressly in the JSA, it's Section 9.4, and it has a dispute resolution process. And it's called the three-step. First, what's required is the management of both companies talk. If that doesn't resolve it, you have to raise it to the joint management committee. And if that doesn't resolve it, then you can have arbitration. So neither party, not BNSF nor Hunt, again, on this committee, is ever without a remedy. And that's where I come back to I don't want the panel to lose focus of what I submit as the issue, which is we're in federal court. We've had years of disarbitration. And very good Judge Smalkin, former chief judge of the Eastern District in Maryland or District of Maryland, was the chair. Very long awards. And everyone agrees they're clear. The federal judge's job was to confirm it, and that's what he did. A federal court's job is not to add additional glosses or interpretations where none is necessary. And that's what Judge Brooks said. He gave several reasons. To me, the most critical was where he said first he found no ambiguity in the panel's directives, and then this is critical, and the parties did not point out any language they contend is ambiguous. So he said, I'm going to confirm it, and that's it. So I would submit, well, one more point there. And then at the end, he said, finally and fatally for Hunt, my words, fatally for Hunt, the court ruled it could not conclude from the evidence Hunt presented and arguments that BNSF violated the plain language of the panel's directives. So I want to come back to where I started. Why are we here? Well, all the parties eventually, I mean, Hunt wanted to vacate these awards. Let's not forget that for years. And then suddenly they said, well, we want you to confirm it, but we wanted some additional relief.  That's the end of the analysis I submit. And whatever rights Hunt was able to secure in the award, they have by judgment. Same thing for BNSF. So I come back to where I started and respectfully ask the court to affirm the district court who in its judgment did nothing more than what exactly he should have done, and that is to confirm the final award. Thank you. Mr. Buelan, you'll have to unmute your microphone. I knew that was going to happen. I want to start with something Mr. Donovan said about better rates. At first he defended the district court saying that its conclusion that BNSF need only disclose better rates was just kind of off the cuff, distilling it. It wasn't really a holding. And then he said, but that's exactly what we have the right to do under the final word. That's exactly what we're doing. But I read from the final award at the top of my argument where the panel said, Hunt, your obligation to disclose rates does depend on whether you think they're better for Hunt or not. It couldn't have been more clearer that that screening was improper. Mr. Donovan was also asked, and I apologize, I can't remember who asked him, well, where does it give you the authority to screen for better rates? And he said, I'll answer that question. And then he went into a long discussion about how rates are quoted by each party. They never answered the question of where in the final award or in the interim award even, there's any authority for his client to screen rates. And that's because the only thing the final award says about screening rates is we absolutely reject BN's explicit argument that we'd be allowed to do that. And we, in the briefs below, we had challenged BNSF to explain how Hunt gets to jointly consider with BNSF these equivalent basis and comparable service factors. If it is done in a BNSF black box, there's still no explanation for how that process that they've implemented unilaterally can square with that directive. Well, before you get to that, though, I am taken by his argument, because this is unique, by the way, it sounds like an accounting nightmare, but about you setting the rates and then you splitting, it seems to me like you kind of have, in plain English, you kind of have plenty of ways to be sure what the rate is by testing the market all the time by what you quote the customers. Why is it, did the panel mention that? Is that out of the blue with you? I'm sorry. I'm not sure. OK. You get to set the rates, right? The business you do with them. Correct. But how much... OK, now, so let me finish. If that's true, did the panel take into account that, boy, you can, in effect, find out what all the rates are. You just keep setting them lower and lower and lower or wherever you want to set them and find out what it is. Then you try a different one. You try this, you try that. Can't you, over time, find out what they are? But tell me if the panel didn't consider that at all. They think it's crazy. You know, I'm not aware of the panel discussing that possibility. But at the end of the Section 3A portion of the final word, it does say, bargain for the right to get access to any rate and pay it instead of the revenue divisions you talked about, Judge Benton. I want to turn briefly to this question of legal authority. And I'll do it very quickly because I don't think this is an issue. This court's decisions in Turner and Harville and RGA all concern the same thing we have here. The parties disagree about what the award says. They, of course, both say it's unambiguous in our favor. But a district court needs to resolve those disagreements when it confirms an award because a district court's order carries the force of law. And it should not be entering an order that carries the force of law if the parties don't understand what it means. And so this is routine, a district court being presented with parties who disagree about what an arbitration award means. And in those circumstances, the precedent here is very clear. The district court's supposed to try to figure out which of them is right. What did the panel mean? Look at the context, look at the contract, look at the ruling. What's your best Eighth Circuit case that you do that before confirmation or at the same time of confirmation? Well, I think that happened at the same time as confirmation, Your Honor. I think that happened in Turner. I think it happened in Harville and I think it happened in RGA. I'm sorry I gave you three, but I think that was the context of all three of those. Counsel, just curious, is it in the record or does the record tell us when and how the parties discovered that they disagree as to what the award means? I don't think it's in the record. I mean, I could I could tell you that there would be at Hunt was waiting for rates and wasn't getting any and discussed it with BN and BN said, you know, we're going to do it this way. And that's when we teed it up for the judge. I want to turn to something that Mr. Donovan said. He said Hunt gets the best rates on. True. The arbitration record is very clear. And I would direct the panel to Appendix 475. There is a fantastic email that was obtained in discovery where BNSF internally was discussing how on 30 percent of the routes Hunt overpaid relative to other carriers. And you know what BNSF said? You know what? They're moving cargo for a different company. Hypothetically, instead of while Hunt's moving it for Walmart, their competitors moving for Amazon. So we'll use that basis to hide those rates from Hunt. That's an appendix 475. That's what happened. And then in this arbitration, you know what BNSF urged the panel to do? Make a factor in whether it could screen rates, whether Hunt was serving the same customer as BNSF's other trucking company that had the better rate. And so the idea that this is just something that can be worked out in business and that there's no efforts here to hide rates is simply unsupported by the record. It's also untrue that Hunt never asked for all rates. On the commercial side, Hunt has been looking for all rates since 2004, the business folks. In the arbitrations, the question presented in 05 and the first time here, the only issue was retrospective damages. So, of course, the calculations were looking at better rates. I see that I'm out of time. So subject to your honor's further questions, that concludes Hunt's argument. We would ask the court to reverse. Hearing none. Thank you, counsel. We appreciate your briefing and appearance today and argument. The case will be submitted and decided in due course.  Thank you.